**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Alexandria Division**

|  |  |
|---|---|
| MARYLAND AND VIRGINIA MILK PRODUCERS COOPERATIVE ASSOCIATION, INCORPORATED d/b/a MAOLA,<br><br>    Plaintiff,<br><br>vs.<br><br>NEW HOPE VIEW FARM, LLC<br><br>    Defendant. | Case No. 1:26-cv-1555 |

**COMPLAINT**

Plaintiff Maryland and Virginia Milk Producers Cooperative Association, Incorporated d/b/a Maola ("MDVA" or the "Cooperative"), by counsel, files this Complaint against Defendant New Hope View Farm, LLC ("New Hope") and alleges as follows:

**PARTIES**

1. MDVA is a Virginia agricultural cooperative association engaged in handling and marketing milk produced by hundreds of member farms located in multiple states, including Virginia, Maryland, Pennsylvania, North Carolina, and New York.

2. MDVA is organized under Virginia law, has the capacity to sue and be sued, and maintains its principal place of business in Herndon, Virginia. MDVA does business under the trade name Maola.

1

3.      New Hope is a New York limited liability company with a principal and/or service address at 5937 US Route 11, Homer, NY 13077. Upon information and belief, all members of New Hope are individuals who are citizens of the State of New York, and no member of New Hope is a citizen of Virginia. New Hope also operates the dairy farm identified in the parties' agreement in Homer, New York.

4.      At all relevant times, New Hope was a dairy producer, a member-producer of MDVA, and a party to a written milk marketing agreement with MDVA, as amended by a written term-extension agreement. That agreement, as amended, is defined below as the Amended Milk Marketing Agreement or Amended MMA.

**JURISDICTION AND VENUE**

5.      This Court has subject-matter jurisdiction under 28 U.S.C. § 1332(a) because the parties are citizens of different states and the amount in controversy exceeds $75,000, exclusive of interest and costs. MDVA is a Virginia agricultural cooperative association with its principal place of business in Herndon, Virginia. New Hope is a New York limited liability company with a principal address in Homer, New York. Upon information and belief, all members of New Hope are citizens of New York. Complete diversity of citizenship therefore exists between the parties. The amount in controversy substantially exceeds $75,000, as MDVA's estimated liquidated damages exceed $2,500,000.

6.      This Court has personal jurisdiction over New Hope under Virginia Code § 8.01-328.1(A)(1) and (A)(2) because this action arises from New Hope's transaction of business in Virginia, supplying of milk to a Virginia corporation and voluntary entry into, performance under, and extension of an ongoing membership and milk-marketing relationship administered in Virginia. New Hope knowingly entered an ongoing contractual and cooperative relationship with

2

a Virginia entity, accepted the benefits of that relationship, and undertook continuing obligations that were administered, governed, and enforced in Virginia. MDVA's claims arise directly from New Hope's Virginia-directed contacts.

7.    Venue is proper in this District and Division under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to MDVA's claims occurred in this District, including MDVA's administration of the parties' cooperative and contractual relationship, receipt and processing of New Hope's performance, and the harm MDVA suffered from New Hope's breach, all of which were centered at MDVA's principal place of business in Herndon, Virginia, within the Eastern District of Virginia. Venue in the Alexandria Division is proper because Fairfax County, where MDVA maintains its principal place of business and where those events occurred, falls within this Division. Venue is also proper under 28 U.S.C. § 1391(b)(3) because New Hope is subject to personal jurisdiction in this District.

8.    Assignment to the Alexandria Division is further appropriate because the claims arise from events and omissions occurring in Fairfax County, Virginia, which is within this Division, and MDVA maintains its principal place of business in Herndon, Virginia, within Fairfax County.

## BACKGROUND

9.    Fluid milk has characteristics that distinguish it from other agricultural commodities. It is highly perishable, produced every day, and difficult to store on the farm for extended periods. As a result, dairy farmers must have their milk transported off the farm frequently, often daily or every other day, regardless of prevailing market conditions.

10.    These features limit an individual producer's ability to withhold supply, wait for better pricing, or negotiate on equal footing with milk buyers. Dairy cooperatives developed in

response to those market realities by allowing dairy producers to coordinate the marketing, transportation, pricing, and sale of their milk through collective action.

11.    MDVA is a farmer-owned dairy cooperative headquartered in Herndon, Virginia and founded in 1920. Through the cooperative structure, hundreds of independent dairy farm families collectively market their raw milk through MDVA, and MDVA undertakes forward-looking obligations involving marketing, supply balancing, transportation, payment administration, processing capacity, and commitments to downstream customers.

12.    MDVA operates as both a collective marketing organization and an integrated dairy supply chain. It processes and markets raw milk and dairy products, including through the Maola brand and third-party private-label channels, enabling member-producers to benefit from economies of scale, more consistent marketing, and shared participation in cooperative returns.

13.    Because raw milk must be continuously marketed and processed, MDVA relies on stable and predictable member milk supply to allocate production, meet customer demand, avoid waste, avoid supply shortfalls, preserve processing and transportation efficiencies, and protect the value of the cooperative for all member-producers. MDVA's cooperative model depends on members honoring their marketing commitments.

**FACTUAL ALLEGATIONS**

**Virginia Agricultural Cooperative Association Act**

14.    MDVA is organized under the Virginia Agricultural Cooperative Association Act (the "Act"), Virginia Code § 13.1-312 et seq. That Act authorizes agricultural cooperative associations to engage in cooperative activities for producers of agricultural products in connection with producing, assembling, marketing, buying, selling, handling, transporting, shipping, or

4

utilizing agricultural products and by-products, as well as furnishing business and other services on a cooperative basis.

15.    The Act authorizes agricultural cooperative associations to act as agent, broker, or attorney-in-fact for their members; to make contracts; to make loans or advances to members or producer-patrons; to establish reserves and surplus; to sue and be sued in the association's corporate name; and to conduct business in the Commonwealth and elsewhere.

16.    Under Virginia Code § 13.1-321, membership in an agricultural cooperative association is limited to bona fide producers of agricultural products and cooperative associations of such producers, and a member who loses membership remains subject to liabilities incurred while a member of the association.

17.    Virginia Code § 13.1-329 expressly authorizes agricultural cooperative associations and their members to make and execute marketing contracts requiring members to sell, for a period not over ten years, all or any specified part of their agricultural products or specified commodities exclusively to or through the association.

18.    Virginia Code § 13.1-329 further provides that the bylaws and marketing contract may fix, as liquidated damages, specific sums to be paid by a member to the association upon breach of provisions regarding the sale, delivery, or withholding of products, and that such provisions are valid and enforceable in the courts of the Commonwealth.

19.    Virginia Code § 13.1-329 also provides that, in the event of a breach or threatened breach of such a marketing contract by a member, the association is entitled to injunctive relief to prevent further breach and to a decree of specific performance.

**The Milk Marketing Agreement**

5

20.      New Hope knowingly entered an ongoing contractual and cooperative relationship with MDVA, a Virginia cooperative, accepted the benefits of that relationship, and undertook continuing obligations that were administered, governed, and enforced in Virginia.  In April 2023, Sarah Head, a principal of New Hope, contacted an MDVA representative seeking MDVA membership and milk-marketing services and then provided six months of production information for MDVA's evaluation. Ex. A. In October 2023, New Hope provided additional on-farm and hauling information so MDVA could arrange onboarding and hauling. Ex. B.

21.      Under the MMA, New Hope became a member-producer of MDVA and agreed to have MDVA manage and market New Hope's milk in accordance with the parties' contractual relationship, MDVA's Articles of Incorporation, Bylaws, and rules and regulations (collectively, "Cooperative Governance Documents"), and the Act. Section 13 of the MMA provides that MDVA's Board of Directors is the sole arbiter of issues relating to performance of the agreement and construction of MDVA's Cooperative Governance Documents, with the Board's decision final and binding. Ex. C, p. 2 § 13. By joining MDVA as a member-producer, New Hope knowingly and voluntarily subjected itself to the rights, obligations, and remedies established by the MMA, MDVA's Cooperative Governance Documents, and the Act's statutory framework, including the exclusive marketing and liquidated-damages provisions of Va. Code § 13.1-329.

22.      The MMA provided for an initial one-year term beginning on the date of New Hope's first shipment of milk under the MMA. New Hope first delivered milk to MDVA on or about January 1, 2024, making the initial term run from January 1, 2024, through December 31, 2024. After the first year, the MMA was subject to automatic renewal for successive one-year periods unless canceled by either party by written notice at least thirty days before expiration of the then-current term. Ex. C, p. 2 § 9.

23.     New Hope's principal responsibility under the MMA was to deliver to MDVA, or to another place designated by MDVA, all marketable milk produced on the farm identified in the agreement, except only quantities required for home or farm use.  New Hope also agreed to produce milk in compliance with applicable laws and regulations and to deliver milk in pure, unadulterated condition suitable for sale or processing. Ex. C, p. 2 §§ 4-5.

24.     MDVA's principal responsibility under the MMA was to market New Hope's milk. MDVA agreed to market New Hope's milk at the best price obtainable under market conditions, in MDVA's sole discretion, and to perform appropriate tests and procedures to determine the quality and quantity of milk delivered. Ex. C, p. 2 §§ 7–8.

### Breach Provisions in the MMA

25.     The MMA sets forth specific remedies if New Hope breaches its obligation to sell all marketable milk to MDVA. The agreement provides that, because MDVA's legal remedy would be inadequate and because actual damages would be impractical and extremely difficult to determine if New Hope failed to sell all marketable milk as required, New Hope agreed to pay MDVA liquidated damages of $2.00 per hundredweight of milk not sold to MDVA during the term of the agreement. The agreed liquidated-damages rate reflects the parties' advance estimate of harm from premature withdrawal and diversion, including, without limitation, anticipated market losses, lost opportunities, disruption to cooperative supply planning, balancing obligations, processor commitments, transportation coordination, plant utilization, and harm to cooperative operations and relationships. Ex. C, p. 2 § 11.

26.     The MMA further provides that, in the event New Hope breaches any material provision of the agreement - particularly the provision requiring New Hope to sell its milk to

MDVA - MDVA may seek injunctive relief to prevent further breach, specific performance of the agreement, and full damages for the breach. Ex. C, p. 2 § 11.

27.     The MMA also states that it is one of a series of marketing agreements whose value depends on adherence by all contracting parties. That provision reflects the cooperative structure underlying the parties' relationship: MDVA's ability to market milk effectively depends on member-producers honoring their exclusive delivery and marketing commitments. Ex. C, p. 2 § 11.

### The Amended MMA and Sustainability Program Benefits

28.     MDVA has made sustainability an important part of its cooperative model. In furtherance of that commitment, MDVA works with governmental, nonprofit, and commercial partners to identify programs, grants, incentives, and other sustainability opportunities for member farms. These opportunities are designed to help dairy farmers improve conservation activities, adopt conservation best management practices, and increase the sustainability of their farming operations.

29.     The benefits of those sustainability programs are substantial and long-lasting. They can include financial payments, cost-share funds, in-kind assistance, conservation investments, and farm improvements that continue to benefit the recipient member and its farm for years.

30.     Because MDVA invests time, staff resources, cooperative relationships, and administrative effort to locate, coordinate, and administer these opportunities, MDVA requests that member-producers who seek to participate in certain sustainability programs commit to remain members and continue marketing their milk through MDVA for an extended period. That extended commitment protects the cooperative and the other member producers who rely on stable supply while the recipient farm receives long-term sustainability benefits.

31.   New Hope voluntarily elected to participate in MDVA-facilitated sustainability opportunities. On or about April 2, 2024, MDVA and New Hope entered into a written Sustainability/Conservation Beneficiary Agreement (the "Sustainability Agreement"). A true and correct copy of the Sustainability Agreement is attached hereto as Exhibit D.

32.   In the Sustainability Agreement, New Hope acknowledged that MDVA had been working with governmental and nonprofit organizations to locate programs, grants, and other incentives to assist dairy farmers in improving conservation activities and adopting conservation best management practices on their farms. New Hope further acknowledged that, because of MDVA's efforts, certain members were able to participate in conservation programs that provided benefits to those members and their farms, and that such benefits last many years. Ex. D, Recitals.

33.   New Hope also expressly acknowledged that it had benefited from participating in one or more conservation programs facilitated by MDVA. In consideration of those benefits, New Hope agreed to continue fully complying with all obligations under its previously executed MMA, which New Hope acknowledged remained in full force and effect. Ex. D ¶¶ 1-2.

34.   The Sustainability Agreement amended the MMA by extending the MMA's renewable annual one-year term to a five-year term beginning January 1, 2024, and continuing through December 31, 2028. At the end of that five-year term, the MMA would revert to a renewable annual one-year term. Ex. D ¶ 2.

35.   The MMA, as amended by the Sustainability Agreement, is referred to herein as the "Amended Milk Marketing Agreement" or "Amended MMA."

36.   Before New Hope executed the Sustainability Agreement, MDVA expressly told New Hope that producers receiving sustainability funding of $100,000 or more through MDVA were asked to extend their marketing contracts. On April 1, 2024, MDVA transmitted the extension

agreement to New Hope and explained that requirement. New Hope then signed and returned the agreement on April 2, 2024. See Ex. D; see also Ex. E.

37.     Under the Amended MMA, New Hope's obligation to sell and deliver all marketable milk to MDVA continued through December 31, 2028, and New Hope could not terminate or discontinue performance before that date without breaching the Amended MMA. Ex. C § 4; Ex. D ¶¶ 2–3.

38.     The five-year extended term in the Amended MMA is within the maximum contract period authorized by Virginia Code § 13.1-329 for exclusive agricultural cooperative marketing contracts.

39.     Following New Hope's execution of the Sustainability Agreement, MDVA worked to identify, coordinate, and administer sustainability program opportunities suited for New Hope in reliance on New Hope's contractual commitment to remain a member and continue marketing all marketable milk through MDVA for the extended term.

40.     New Hope's Climate Smart opportunity came to it through MDVA and MDVA's program partners. New Hope itself later described the program as one it had signed up for "through our Milk Co-Op, Maryland Virginia," with MDVA and the Conservation Innovation Fund managing the application and data-collection process. Ex. F.

41.     In reliance on MDVA-facilitated sustainability commitments and expected program payments, New Hope ordered a manure injector bar from PikeSide Enterprises for $61,227.77, financed the purchase on its line of credit at 8% annual interest and advised MDVA and program partners that the remaining balance of $42,894.44 would also have to be financed pending program disbursement. MDVA's program partners then agreed to add accumulated

interest to New Hope's payment through an amendment process so New Hope could pay down both principal and interest. Exs. G-H.

42.    New Hope's sustainability commitments went beyond equipment acquisition. In its January 24, 2024, sustainability survey submitted to MDVA, New Hope reported that it had adopted or planned to adopt no-till and reduced tillage practices, nutrient-management changes including manure injection and incorporation and split applications, and additional cover cropping and manure storage improvements.

43.    New Hope's conservation planning was documented and detailed. On or about February 15, 2024, weeks after executing the Sustainability Agreement, Sarah Head transmitted to MDVA eight pages of color-coded field mapping notes identifying all fields designated for hay over the next five years and all corn fields eligible for manure injection that year.  See Ex. I. New Hope also noted that approximately 1,400 acres of corn were eligible for cover cropping and that, if program funding were made available, New Hope would hire out that work. Id. These written, field-specific planning communications, made in direct connection with New Hope's sustainability program participation, demonstrate that New Hope actively engaged with and invested in the MDVA-facilitated program on a granular operational level.

44.    MDVA and its program partners devoted substantial time and effort to New Hope's program participation, including assistance with data collection, producer communication, portal issues, and problem solving as funding and disbursement issues arose. New Hope later acknowledged that MDVA personnel, program partners, and New Hope's principals had put in "days of book work" collecting field-practice information for the prior five years. Ex. F.

45.    New Hope received, and/or became eligible to receive, substantial sustainability-related funding and conservation benefits, including USDA Climate Smart funding and related

11

conservation-program benefits, in amounts to be proven at trial and as reflected in MDVA's program records.

46.    On February 21, 2025, New Hope wrote to congressional staff explaining that it had signed up for the Climate Smart Commodities grant through MDVA; that MDVA and program partners had worked with New Hope on the data-collection process; that New Hope had purchased a manure injection system and manure dragline system in reliance on the expected grant funding; that New Hope had budgeted specifically for that funding; and that because the program was USDA-funded, New Hope could not also seek duplicative Soil and Water assistance for the same practices. Ex. F.

47.    No subsequent amendment or modification was made to the Amended MMA to rescind the extended term or revise New Hope's obligation to sell and deliver all marketable milk to MDVA through December 31, 2028. Ex. C § 14; Ex. D ¶ 2.

48.    New Hope provided written notice to MDVA of New Hope's intent to terminate the Amended MMA and its cooperative membership effective January 1, 2026.

49.    New Hope's notice of intent to terminate was communicated on or about November 4, 2025, when Sarah Head sent an email to MDVA personnel advising that New Hope had decided "to move forward and give notice to Maryland Virginia." New Hope attributed the decision to "an increasingly difficult market" and expressed appreciation for MDVA's ongoing support and a desire to maintain a good working relationship. Notably, the notice did not, at that time, identify any alleged breach or failure of performance by MDVA as a basis for termination; that contention appeared for the first time only after MDVA asserted its contractual rights.

**MDVA's Efforts to Resolve**

50. After receiving New Hope's November 4, 2025, notice email, MDVA did not accept the notice as a valid termination of the Amended MMA. Instead, MDVA responded in writing and advised New Hope that the Amended MMA remained in full force and effect through December 31, 2028.

51. MDVA explained to New Hope that, under the Amended MMA, New Hope remained obligated to deliver all marketable milk produced on the New Hope farm to MDVA for the full extended term. MDVA further advised that New Hope's stated discontinuation of membership effective January 1, 2026, would constitute a material breach of the Amended MMA and would require payment of liquidated damages for milk volumes sold to third parties rather than to MDVA during the remaining term through December 31, 2028.

52. In an effort to avoid litigation, MDVA requested that New Hope either withdraw its notice of discontinuation or confirm that it would pay liquidated damages of $2.00 per hundredweight on milk not sold to MDVA through December 31, 2028. MDVA also expressly reserved all rights and remedies under the Amended MMA and applicable law, including the right to seek injunctive relief and other appropriate remedies.

53. New Hope did not withdraw its termination notice. By letter dated December 11, 2025, New Hope instead asserted constructive breach of the parties' agreement and claimed, for the first time, that its performance obligations had been discharged. The grounds identified in New Hope's letter included hauling matters, capital-retain and quality-premium issues, the terms of the Sustainability Agreement and related program benefits, operational burdens and equipment wear, and local market opportunities.

54. One issue identified in New Hope's December 11, 2025, letter concerned quality premiums. In or about late 2024, New Hope's milk had a somatic cell count ("SCC") that exceeded

13

the 250,000-cell threshold required to qualify for MDVA's Preliminary Incubation ("PI") premium, resulting in the loss of that premium for four months. When New Hope raised this concern, MDVA responded promptly: MDVA management approved a goodwill prior-month payment adjustment of $0.30 per hundredweight on September 2024 milk, totaling $10,804.27 (based on 36,014.24 cwts), applied to New Hope's October 2024 settlement to assist with the cost of Dairy One herd testing. MDVA also confirmed that New Hope's October 2024 SCC was already improving and that New Hope was on track to qualify for its PI and SCC premiums for that month.

55.     New Hope's December 11, 2025, letter acknowledged the central terms of the parties' agreements. Specifically, New Hope acknowledged that the MMA obligated it to deliver "all marketable milk" to MDVA, that the MMA contained a $2.00 per hundredweight liquidated-damages provision, and that the Sustainability Agreement extended the one-year term to a fixed five-year term during which New Hope committed to remain with MDVA.

56.     New Hope's December 11, 2025, letter further confirmed that its decision to leave MDVA was driven, at least in substantial part, by what New Hope described as a "substantial and immediate revenue opportunity" in another market. None of the grounds identified in New Hope's letter - including that asserted market opportunity - constituted a material breach by MDVA or otherwise excused New Hope's obligation to perform under the Amended MMA through December 31, 2028.

57.     Even in spring 2025, months before its November 2025 notice, New Hope continued to work cooperatively with MDVA and did not claim that MDVA had materially breached the parties' agreements. In April 2025, MDVA nominated New Hope for the Leopold conservation award, and New Hope thanked MDVA for the nomination and submitted materials

14

in support of it. Ex. J. This is inconsistent with any claim that New Hope was then treating MDVA as having already committed a material breach.

58.    After New Hope ceased performance effective January 1, 2026, the parties continued to exchange correspondence concerning the consequences of New Hope's breach, the calculation of liquidated damages, contractual setoff, mediation, and potential resolution.

59.    MDVA owed New Hope amounts for milk New Hope delivered to MDVA in December 2025. As of January 2026, New Hope owed MDVA liquidated damages under the Amended MMA for milk not sold to MDVA after New Hope ceased delivering milk effective January 1, 2026. MDVA calculated New Hope's accrued liquidated damages for January 2026 at $79,488.58, based on New Hope's December 2025 production of 3,974,429 pounds, converted to hundredweight, and multiplied by the contractual liquidated-damages rate of $2.00 per hundredweight. See Ex. C § 11.

60.    MDVA set off the $79,488.58 owed by New Hope to MDVA against the amounts MDVA otherwise owed to New Hope for December 2025 milk and paid New Hope the remaining balance. See Ex. C § 9.

61.    Based on historical production, MDVA estimated that total liquidated damages for the unexpired term exceed $2,500,000.00, subject to proof and reconciliation based on actual production and diversion data.

62.    MDVA advised New Hope that payment of the non-setoff amount did not cure New Hope's breach, alter New Hope's ongoing liability for liquidated damages, or excuse future production and diversion of marketable milk to third parties during the unexpired term of the Amended MMA.

15

63.     Because the precise volume of New Hope's post-January 1, 2026, milk production, sales, and diversions are uniquely within New Hope's knowledge and control, MDVA expressly reserved the right to reconcile, adjust, credit, or refund amounts once accurate production and diversion data are provided or otherwise determined. MDVA invited New Hope to provide information supporting any different calculation.

64.     MDVA further advised New Hope that, consistent with the Amended MMA, MDVA expected New Hope to regularly remit liquidated damages at the rate of $2.00 per hundredweight for all marketable milk sold to third parties during the unexpired term.

65.     MDVA also made clear that liquidated damages continued to accrue while mediation was pending and that, unless New Hope provided reliable information regarding actual diversion volumes, MDVA's monthly damage estimates would be based on historical production data and remain subject to reconciliation.

66.     MDVA also expressed willingness to mediate the dispute promptly and in good faith and proposed escrow and other resolution mechanisms to permit mediation to proceed without waiving contractual rights.

67.     MDVA's post-notice communications confirm that MDVA did not waive, release, or excuse New Hope's obligations under the Amended MMA. Rather, MDVA consistently maintained that the Amended MMA remained enforceable through December 31, 2028, attempted to resolve the dispute without litigation, invited New Hope to provide actual production and diversion data, set off accrued liquidated damages against amounts otherwise owed for December 2025 milk, and reserved all rights to recover liquidated damages and pursue contractual, statutory, legal, and equitable remedies.

**New Hope's Attempted Early Termination and Diversion of Milk**

16

68. New Hope ceased selling and delivering its marketable milk to MDVA on or about December 31, 2025.

69. Upon information and belief, after January 1, 2026, New Hope began selling, delivering, diverting, or otherwise marketing its marketable milk to one or more third parties instead of MDVA. Upon information and belief, one such third party was Byrne Dairy, located at 2394 US Route 11, LaFayette, New York 13084.

70. New Hope's third-party milk sales and diversions are within New Hope's knowledge and control. MDVA is entitled to discovery and, as appropriate, an accounting or production of records sufficient to determine all marketable milk New Hope failed to sell to MDVA during the unexpired extended term of the Amended MMA.

71. As set forth in paragraph 60 above, MDVA calculated January 2026 liquidated damages at $79,488.58 based on available historical production data and estimated total liquidated damages for the unexpired term of the Amended MMA in excess of $2,500,000, subject to reconciliation based on actual production and diversion data.

72. MDVA has not waived, released, or excused New Hope's obligations under the Amended MMA or the liquidated-damages provision.

73. Liquidated damages continue to accrue for each hundredweight of marketable milk that New Hope sells, delivers, diverts, or otherwise markets to third parties instead of MDVA during the unexpired term of the Amended MMA.

## COUNT I - BREACH OF CONTRACT

74. MDVA incorporates by reference the allegations in paragraphs 1 through 73 as if fully set forth herein.

17

75.    The Amended MMA is a valid, binding, and enforceable written contract supported by consideration. Exs. C-D.

76.    The Amended MMA is also an agricultural cooperative marketing contract authorized by Virginia Code § 13.1-329 because it requires New Hope, a member-producer, to sell all marketable milk exclusively to or through MDVA for a period not exceeding ten years. Ex. C § 4; Ex. D ¶ 2.

77.    The liquidated-damages provision in the Amended MMA is valid and enforceable under Virginia Code § 13.1-329(b), which authorizes agricultural cooperative bylaws and marketing contracts to fix specific sums payable as liquidated damages upon breach of provisions regarding the sale, delivery, or withholding of products. Ex. C § 11.

78.    MDVA performed, substantially performed, or was ready, willing, and able to perform its obligations under the Amended MMA. New Hope's asserted grounds for constructive breach, including alleged hauling, retain, premium, operational, market-access, and sustainability-related objections, did not constitute a material breach by MDVA and did not discharge New Hope's performance obligations.

79.    New Hope materially breached the Amended MMA by, among other things, attempting to terminate the extended term effective January 1, 2026, ceasing to deliver and sell all marketable milk to MDVA, and selling, delivering, diverting, or otherwise marketing marketable milk to one or more third parties during the unexpired extended term. Ex. C § 4; Ex. D ¶¶ 2–3.

80.    New Hope's breaches triggered the liquidated-damages provision requiring New Hope to pay MDVA $2.00 per hundredweight for all marketable milk not sold to MDVA during the unexpired term of the Amended MMA. Ex. C § 11.

18

81.     The liquidated-damages provision is enforceable because, at the time of contracting, the damages that would result from New Hope's premature withdrawal and diversion of milk were impractical and extremely difficult to determine, and the agreed sum was a reasonable forecast of the harm to MDVA and the cooperative structure. The provision is also expressly authorized by Virginia Code § 13.1-329, which permits agricultural cooperative associations and their members to fix specific sums as liquidated damages upon breach of provisions regarding the sale, delivery, or withholding of products.

82.     As a direct and proximate result of New Hope's breaches, MDVA has suffered and continues to suffer damages, including liquidated damages through December 31, 2028, in an amount to be proven at trial, subject to reconciliation based on actual production and diversion data.

83.     MDVA is entitled to judgment against New Hope for breach of contract, liquidated damages, pre-judgment and post-judgment interest, costs, and all other relief allowed by law or contract.

## COUNT II - DECLARATORY JUDGMENT

84.     MDVA incorporates by reference the allegations in paragraphs 1 through 83 as if fully set forth herein.

85.     An actual, present, and justiciable controversy exists between MDVA and New Hope concerning the parties' rights and obligations under the Amended MMA.

86.     That controversy includes, among other issues, whether New Hope may terminate or discontinue performance before December 31, 2028; whether New Hope is obligated to sell all marketable milk to MDVA during the extended term; whether New Hope's third-party sales and

diversions breach the Amended MMA; and whether New Hope owes liquidated damages of $2.00 per hundredweight for all marketable milk not sold to MDVA during the unexpired extended term.

87.    MDVA seeks a declaration that: (a) the Amended MMA remains valid and enforceable through December 31, 2028; (b) New Hope's cessation of performance effective January 1, 2026 and third-party milk sales or diversions constitute breaches of the Amended MMA; (c) the Amended MMA's liquidated-damages provision is valid and enforceable, including under Virginia Code § 13.1-329; and (d) New Hope is obligated to pay MDVA $2.00 per hundredweight for all marketable milk not sold to MDVA during the unexpired extended term, subject to proof and reconciliation of actual volumes.

## COUNT III – SPECIFIC PERFORMANCE AND INJUNCTIVE RELIEF

88.    MDVA incorporates by reference the allegations in paragraphs 1 through 87 as if fully set forth herein.

89.    The Amended MMA requires New Hope to sell and deliver to MDVA, or to another place designated by MDVA, all marketable milk produced on the farm identified in the Amended MMA, except quantities required for home or farm use, through December 31, 2028. Ex. C § 4; Ex. D ¶¶ 2–3.

90.    The Amended MMA expressly provides that, in the event of New Hope's breach of any material provision - particularly the provision requiring New Hope to sell its milk to MDVA - MDVA may seek injunctive relief to prevent further breach and specific performance of the agreement. Ex. C § 11.

91.    Virginia Code § 13.1-329 likewise authorizes agricultural cooperative marketing contracts requiring members to sell agricultural products exclusively to or through the cooperative

and provides that, in the event of breach or threatened breach of such a contract, the association is entitled to injunctive relief to prevent further breach and to a decree of specific performance.

92.    New Hope has breached and continues to breach the Amended MMA by selling, delivering, diverting, or otherwise marketing its marketable milk to one or more third parties instead of MDVA during the unexpired extended term.

93.    New Hope's continued diversion of milk threatens ongoing and irreparable harm to MDVA and its member cooperative structure, including loss of milk supply, disruption of customer commitments, loss of market opportunities, harm to cooperative operations, and injury to the value of MDVA's series of member marketing agreements.

94.    Money damages alone are inadequate because New Hope's ongoing breach affects MDVA's cooperative supply, customer relationships, production planning, marketing commitments, sustainability-program administration, and the reliance interests of MDVA and its member-producers.

95.    Allowing a member that accepted long-term sustainability benefits in exchange for an extended commitment to leave early whenever another market appears temporarily more attractive would undermine MDVA's ability to enforce member commitments generally, to plan milk supply, and to continue offering similar programs for the benefit of all members. The resulting harm is cooperative-wide, ongoing, and not fully compensable by money alone.

96.    MDVA is entitled to temporary, preliminary, and permanent injunctive relief requiring New Hope to comply with the Amended MMA and prohibiting New Hope from selling, delivering, diverting, transferring, or otherwise marketing marketable milk to any person or entity other than MDVA, or another place designated by MDVA, during the unexpired term of the Amended MMA.

21

97.     MDVA is also entitled to specific performance requiring New Hope to perform its exclusive delivery and marketing obligations under the Amended MMA through December 31, 2028. Ex. C §§ 4, 11; Ex. D ¶¶ 2–3.

98.     To the extent the Court determines that specific performance should be limited or unavailable for any portion of the remaining term, MDVA seeks temporary and permanent injunctive relief prohibiting further diversion to third parties, together with continuing accounting and liquidated damages.

## COUNT IV - EQUITABLE ACCOUNTING

99.     MDVA incorporates by reference the allegations in paragraphs 1 through 98 as if fully set forth herein.

100.    The Amended MMA requires New Hope to pay MDVA liquidated damages of $2.00 per hundredweight for all marketable milk not sold to MDVA during the unexpired term. Ex. C § 11.

101.    Since January 1, 2026, New Hope has sold, delivered, diverted, or otherwise marketed marketable milk to one or more third parties instead of MDVA.

102.    The volume of milk produced by New Hope, the volume sold or delivered to third parties, the identity of third-party purchasers, the dates of sale or delivery, the prices received, and related hauling, settlement, and payment records are uniquely within New Hope's possession, custody, and control.

103.    Without an accounting, MDVA cannot determine the full amount of liquidated damages owed by New Hope for milk not sold to MDVA during the unexpired extended term of the Amended MMA.

104.    MDVA has estimated liquidated damages based on historical production information, including December 2025 production, but those estimates are subject to reconciliation based on actual production, sale, delivery, and diversion data.

105.    New Hope should be required to provide a complete accounting of all milk produced, sold, delivered, transferred, diverted, or otherwise marketed from January 1, 2026, through the date of judgment and, if necessary, through December 31, 2028.

106.    MDVA is entitled to an equitable accounting, including production of monthly production records, milk statements, settlement statements, hauling records, sales records, purchaser records, payment records, and all other documents sufficient to determine the volume of marketable milk New Hope failed to sell to MDVA during the unexpired term of the Amended MMA.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Maryland and Virginia Milk Producers Cooperative Association, Incorporated d/b/a Maola respectfully requests that the Court enter judgment in its favor and against Defendant New Hope View Farm, LLC and award the following relief:

A.  Judgment in favor of MDVA and against New Hope for breach of contract under the Amended MMA.

B.  Liquidated damages of $2.00 per hundredweight for all marketable milk New Hope failed to sell to MDVA during the unexpired extended term of the Amended MMA through December 31, 2028, in an amount to be proven at trial and presently estimated based on historical production to be approximately $2,720,970.90, subject to reconciliation based on actual production and diversion data.

23

C.  A declaration that the Amended MMA is valid, binding, and enforceable through December 31, 2028; that New Hope's attempted termination, cessation of performance, and third-party milk sales or diversions constitute breach of the Amended MMA; and that the Amended MMA's liquidated-damages provision is valid and enforceable.

D.  Injunctive relief and/or specific performance requiring New Hope to comply with its exclusive delivery and marketing obligations under the Amended MMA and prohibiting New Hope from selling, delivering, diverting, transferring, or otherwise marketing marketable milk to persons or entities other than MDVA, or another place designated by MDVA, during the unexpired term of the Amended MMA.

E.  An equitable accounting and related records relief requiring New Hope to account for and produce records sufficient to determine all milk produced, sold, delivered, transferred, diverted, or otherwise marketed from January 1, 2026, through the unexpired term of the Amended MMA.

F.  Prejudgment and post-judgment interest as allowed by law.

G.  Costs, attorneys' fees, and litigation expenses to the extent recoverable by contract, statute, or other applicable law; and

H.  Such other and further relief as the Court deems just and proper.

Dated:  June 5, 2026                          Respectfully submitted,


/s/*Alex Menendez*
Alex Menendez (VSB No. 395724)
WATKINSON MILLER PLLC
1100 New Jersey Ave SE, Ste. 910
Washington, DC 20003
(t) 202.842.2345
(f) 202.464.5317
amenendez@watkinsonmiller.com
Attorney for Maryland and Virginia Milk Producers
Cooperative Association, Incorporated